## UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ELIZABETH EARL and JEANETTE ROCK, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| v. | |
| UNILEVER UNITED STATES INC., | |
| Defendant. | |

Plaintiffs Elizabeth Earl and Jeanette Rock ("Plaintiffs"), by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge, against Defendant Unilever United States Inc., ("Defendant").

### NATURE OF THE ACTION

1.     This is a class action lawsuit regarding Defendant's manufacturing, distribution, and sale of antiperspirant/deodorant and dry shampoo products sold under various brands ("Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.  The Products at issue are:

 (a)   Suave 24-hour Protection Powder Aerosol Antiperspirant

 (b)   Dove Dry Shampoo Volume and Fullness

 (c)   Dove Dry Shampoo Fresh Coconut

 (d)   Dove Dry Shampoo Fresh and Floral

 (e)   Dove Dry Shampoo Ultra Clean

 (f)   Dove Dry Shampoo Invisible

 (g)   Dove Dry Shampoo Detox and Purify

     (h)     Dove Dry Shampoo Clarifying Charcoal

     (i)     Dove Dry Shampoo Go Active

     (j)     Nexxus Dry Shampoo Refreshing Mist

     (k)     Nexxus Inergy Foam Shampoo

     (l)     Suave Dry Shampoo Hair Refresher

     (m)     Suave Professionals Dry Shampoo Refresh and Revive

     (n)     TRESemmé Dry Shampoo Volumizing

     (o)     TRESemmé Dry Shampoo Fresh and Clean

     (p)     TRESemmé Pro Pure Dry Shampoo

     (q)     Bed Head Oh Bee Hive Dry Shampoo

     (r)     Bed Head Oh Bee Hive Volumizing Dry Shampoo

     (s)     Bed Head Dirty Secret Dry Shampoo

     (t)     Bed Head Rockaholic Dirty Secret Dry Shampoo

2.     These Products are not designed to contain benzene, and in fact no amount of benzene is acceptable in dry shampoo products such as the Products manufactured, distributed, and sold by Defendant. Thus, the presence of benzene in the Products renders them adulterated and misbranded, and therefore illegal to sell under both federal and state law. As a result, the Products are unsafe and illegal to sell under federal law, and therefore worthless. *See Barnes v. Unilever United States Inc.*, 2022 WL 2915629, at *1-3 (N.D. Ill. July 24, 2022); *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.,* 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021).

3.     Further, although Defendant lists both active and inactive ingredients on the Products' labels, benzene is not among those ingredients listed. Thus, Defendant misrepresents

that the Products do not contain benzene, or otherwise Defendant fails to disclose that the Products contain benzene. Plaintiffs and other Class Members would not have purchased the Products, or would have paid substantially less for the Products, had Defendant disclosed that the Products contained or risked containing benzene, or otherwise not misrepresented that the Products did not contain or were not at risk of containing benzene.

4.      Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals. The Department of Health and Human Services has determined that benzene causes cancer in humans. Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity." Benzene is associated with blood cancers such as leukemia.[1]

5.      A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe,"[2] which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[3]

6.      The World Health Organization has stated "[h]uman exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including

---

[1] National Cancer Institute, Cancer-Causing Substances, Benzene, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[2] F.T. Hunter, *Chronic Exposure to Benzene (Benzol). II. The Clinical Effects*, 21 JOURNAL OF INDUSTRIAL HYGIENE AND TOXICOLOGY 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388

[3] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW OF PUBLIC HEALTH 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

cancer and haematological effects."[4]

7.      According to the American Cancer Society:

> IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[5]

8.      The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells." The CDC also cautions that "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[6]

9.      According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin and/or eye contact.**"[7]

10.      Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products, containing said harmful chemicals, from reaching consumers. Valisure is a company with a core mission "to help ensure the safety, quality and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas

---

[4] https://www.who.int/teams/environment-climate-change-and-health/chemical-safety-and-health/health-impacts/chemicals/benzene.

[5] American Cancer Society. Benzene and Cancer Risk (January 5, 2016), https://www.cancer.org/cancer/cancer-causes/benzene.html.

[6] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[7] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html (emphasis added).

manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard methods to test medications and consumer products distributed in the United States."[8]

11.     Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine ("NDMA") in ranitidine, NDMA in metformin, benzene in hand sanitizers, benzene in sun care products, and benzene in antiperspirants.  Each time, Valisure's detection of benzene and other carcinogens has been independently confirmed by industry and led to recalls by manufacturers over the subject products.

12.     On November 3, 2021, Valisure tested for benzene in various types of antiperspirants utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation."[9]  The FDA used the same method to test for impurities list benzene in hand sanitizers.[10]

13.     After conducting this testing, Valisure "detected high levels of benzene in specific batches of body spray products products."[11]

14.     Valisure tested the Suave-brand antiperspirant products manufactured and sold by Defendant, which were found to contain as much as 5.21 parts per million ("ppm") of benzene[12]:

---

[8] VALISURE, VALISURE DETECTS BENZENE IN BODY SPRAY PRODUCTS (November 4, 2021), https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb _Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260 %5D.pdf (the "VALISURE PETITION").

[9] *Id.* at 7.

[10] https://www.fda.gov/media/141501/download.

[11] VALISURE PETITION, at 1.

[12] *Id.* at 12-14.

| Brand | UPC | Lot | Expiration | Description | Average ppm |
|-------|-----|-----|------------|-------------|-------------|
| Suave | 079400751508 | 07151AD14 | 07/2023 | 24 Hour Protection, Powder, Aerosol | 5.21 |
| Suave | 079400785503 | 08091AD00 | 08/2023 | 24 Hour Protection, Powder, Aerosol | 2.30 |
| Suave | 079400785503 | 08091AD02 | 08/2023 | 24 Hour Protection, Powder, Aerosol | 2.24 |
| Suave | 079400784902 | 08141AD00 | 08/2023 | 24 Hour Protection, Powder, Aerosol | 0.97 |

15.    Defendant eventually issued a voluntary recall of the Products—*four months after* Valisure's report came out.[13]   However, Defendant's recall was inadequate for numerous reasons.  Namely, Defendant discontinued the Suave line for "business reasons" in October 2021, but did not initiate the recall until March 2022, *five months* after Defendant ceased selling the Products.  Further, Defendant has required proof of purchase for consumers to procure any payment from the recall.  Thus, in order to make use of the recall, consumers

---

[13] UNILEVER ISSUES VOLUNTARY NATIONWIDE RECALL OF SUAVE 24-HOUR PROTECTION AEROSOL ANTIPERSPIRANT POWDER AND SUAVE 24-HOUR PROTECTION AEROSOL ANTIPERSPIRANT FRESH DUE TO PRESENCE OF SLIGHTLY ELEVATED LEVELS OF BENZENE, (Mar. 30, 2022), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-nationwide-recall-suave-24-hour-protection-aerosol-antiperspirant-powder.

would have had to retain a carcinogenic, disposable product for at least five months to make use of Unilever's recall. And even then, Unilever often offers coupons for replacement products as opposed to full refunds for purchasers. Finally, Unilever is only offering any sort of remedy for a specific lot of the Product, not all lots. Thus, Unilever's recall is in no way adequate.

16.     On top of the foregoing, it is clear the benzene contamination in Defendant's Products than Defendant's first "recall" let on. To wit, in October 2022, Unilever announced that "select lot codes of dry shampoo aerosol products produced prior to October 2021 from Dove, Nexxus, Suave, TIGI (Rockaholic and Bed Head), and TRESemmé" were being recalled "due to potentially elevated levels of benzene." Unilever instructed consumers to "stop using the affected aerosol dry shampoo products."[14]

17.     In other words, since the release of the Valisure Petition, Unilever has orchestrated *two separate recalls* for *two separate types* of products: antiperspirants and dry shampoos.

18.     Defendant's dry shampoo recall is also inadequate. Namely:

- The recall is limited to products purchased *before* October 2021, even though products sold after this date likely continue to be contaminated. Further, the recall is limited to only specific lots of the Products.

- To get compensation under the recall, consumers are required to have proof of purchase, which is unlikely for disposable products bought at retail stores that are over a year old. Without proof of purchase, consumers are limited to a cash refund for *one* product, despite the fact that consumers buy such products regularly. Making matters even more difficult, the link to Defendant's recall is not listed on the FDA's recall notice.

- Defendant failed to adequately publicize the recall such that consumers were aware of it.

---

[14] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-us-recall-select-dry-shampoos-due-potential-presence-benzene.

- Although Defendant states "[a]n internal investigation identified the propellant as the source, and Unilever has worked with its propellant suppliers to address this issue,"[15] this is cold comfort to consumers who already used and were exposed to Defendant's dangerous products. This is a likely result given the recall was announced in November 2022 but covered products sold over a year ago. Further, given this is Defendant's *second* benzene-related recall in the last year, any such promises are hollow.

- In its recall announcement, Defendant does not disclose how many products it tested or what levels of benzene were detected in those products. The failure to disclose such information is concerning, since there is "no safe level of benzene" exposure.

19. The FDA does state that if the use of benzene is "if benzene use is **unavoidable** to produce a drug product with a significant therapeutic advance, then its levels should be restricted to 2 parts per million (ppm), unless otherwise justified.[16] However, Defendant's Products contain levels of benzene above this amount. Regardless, the Products are not designed to contain benzene, as antiperspirants and dry shampoo products have long been sold without any sort of benzene contamination. Moreover, as to the antiperspirant products, Valisure found "[b]ecause many of the body spray products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their manufacture, and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance."[17]

20. Defendant did not disclose the actual or potential presence of benzene in its Products on the Products' labeling, advertising, marketing, or sale of the Products.

---

[15] https://www.unileverrecall.com/.

[16] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (emphasis added).

[17] VALISURE PETITION, at 1-2.

21.     Antiperspirant body spray products are considered over-the-counter drugs and certain deodorant body sprays are considered cosmetics that are regulated by the U.S. Food and Drug Administration."[18]

22.     The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of all antiperspirant and deodorant products, including safety data on its ingredients.[19]

23.     As OTC drug products regulated by the FDA, the antiperspirant products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state law analogues. These cGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

24.     The cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." 21 C.F.R. § 210.1(a). In other words, manufacturers, like Unilever, at all phases of the design, manufacture, and distribution chain are bound by these requirements.

25.     The cGMPs set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and

---

[18] VALISURE PETITION, at 1.

[19] FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Mar. 2, 2022).

drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

26.     Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

27.     FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

28.     A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

29.     "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6).

30.     Similarly, dry shampoos are considered cosmetics that are regulated by the FDA pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as well as analogous state statutes and regulations.  The FDCA prohibits the distribution of cosmetics which are adulterated or misbranded.  A cosmetic is considered adulterated "if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual." 21 U.S.C. § 361(a).

31.     A cosmetic is also adulterated "[i]f it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."  21 U.S.C. § 361(c).

32.     A cosmetic is misbranded if "its labeling is false or misleading in any particular," and if its packaging does not bear "a label containing … an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count."  21 U.S.C. §§ 362(a)-(b)(2). Further, as cosmetics regulated by the FDA, the Products must "bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product." 21 C.F.R. § 740.1(a).

33.     Any cosmetic product that is adulterated or misbranded is illegal to sell.  21 U.S.C. § 331(a).  Adulterated and misbranded products thus have no economic value and are legally worthless.

34.     The Illinois Food, Drug and Cosmetic Act ("IL FDCA") has expressly adopted these federal labeling requirements as its own. The definition of "adulterated" as defined by 410 ILCS 620/14 is exactly the same as the FDCA.

35.     The mere presence of benzene—which, upon information and belief, resulted from Defendant's failure to comply with cGMPs—renders the antiperspirant products both adulterated *and* misbranded under the FDCA.  The antiperspirant products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(1).

36.     The antiperspirant products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 352(a)(1).

37.     Similarly, the presence of benzene renders the dry shampoo products adulterated *and* misbranded.  As alleged above, benzene is a poisonous and deleterious substance that has been linked to cancer and is dangerous at any level.  The Products were also manufactured in such an insanitary way that they became contaminated with benzene.  Thus, the Products are adulterated.

38.     The dry shampoo products' labeling also failed to disclose the existence of benzene in the Products, and the ingredients section of the Products' labeling does not list "benzene" as an ingredient.  Further, the Products' labeling does not disclose the presence of benzene, even though a warning statement concerning benzene is necessary or appropriate to prevent a health hazard.  21 C.F.R. § 740.1(a).  Therefore, the Products are also "misbranded."

39.     As a manufacturer, distributor, and seller of cosmetics products, Defendant has a duty to ensure its Products did not contain excessive (or any) levels of benzene, including through

regular testing. But based on Valisure's testing results set forth above, and Defendant's *two recalls* related to benzene contamination, Defendant made no reasonable effort to test its Products for benzene or other impurities. Nor did it disclose to Plaintiffs or any other consumers in any product advertising, labeling, packaging, or marketing that its dry shampoo Products contained benzene, in some instances many multiples beyond the emergency interim limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products safe and effective for their intended use, were of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

40.     If Defendant had fulfilled its quality assurance obligations, Defendant would have identified the presence of the benzene contaminant almost immediately.

41.     Further, had Defendant adequately tested its Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered the Products contained benzene at levels above the FDA's limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

42.     Accordingly, Defendant knowingly, or at least negligently, introduced contaminated, adulterated, and/or misbranded Products containing dangerous amounts of benzene into the U.S. market.

43.     Defendant also knew or should have known about the carcinogenic potential of benzene because benzene is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans." In addition, in the last year, numerous manufacturers have issued recalls of their products due to the presence of benzene. Defendant should therefore have been on high alert to test its Products for the presence of benzene.

44.     When Plaintiffs purchased Defendant's Products, Plaintiffs did not know, and had no reason to know, that Defendant's Products were adulterated and misbranded and thus unlawful to sell as set forth herein.  Not only would Plaintiffs not have purchased Defendant's Products at all had they known the Products contained or risked containing benzene, they would not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens, reproductive toxins, and impurities, because the Products would have been deemed adulterated and misbranded, and therefore illegal to sell.

45.     Moreover, no reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendant's products).

46.     Thus, if Plaintiffs and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products at all, or would have paid significantly less for the Products, making such omitted facts material to them.

47.     Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and misbranded due to the presence of harmful levels of benzene.  Such illegally sold products are worthless and have no value.  *See Barnes v. Unilever United States Inc.*, 2022 WL 2915629, at *1-3 (N.D. Ill. July 24, 2022); *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021).

48.     Further, Plaintiffs and Class Members bargained for a dry shampoo product free of contaminants and dangerous substances, and were deprived the basis of their bargain when Defendant manufactured and sold them products containing or at risk of containing the dangerous

substance benzene. Had Defendant not misrepresented that the Products did not contain or were not at risk of containing benzene, and/or had Defendant not failed to disclose that the Products contained or were at risk of containing benzene, Plaintiffs and Class Members would not have purchased the Products or would not have paid as much for the Products based on these misrepresentations or omissions.

49. Plaintiffs and Class members are entitled to damages for the monies paid to purchase the Products, statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

50. Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages and restitution for: (i) violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA") 815 ILCS 505/1, *et seq.*; (ii) fraud; (iii) unjust enrichment, and (iv) violations of the state consumer fraud acts.

## **PARTIES**

51. Plaintiff Elizabeth Earl is a resident of Lansing, Illinois and has an intent to remain there, and is therefore a citizen of Illinois. Within the last year, Ms. Earl has purchased multiple canisters of Defendant's Suave 24 Hour Protection Powder, Aerosol product from a Target store in Illinois. Ms. Earl purchased the antiperspirant products for personal use. When purchasing the antiperspirant products, Ms. Earl reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the antiperspirant products were properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell. Ms. Earl relied on these representations and warranties in deciding to purchase the antiperspirant products manufactured and sold by Defendant, and these representations and warranties were part of the basis of the bargain, in that they would not have

purchased the antiperspirant products from Defendant if they had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell. The antiperspirant products Ms. Earl purchased were contaminated with benzene, therefore rendering the products improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell. Thus, Ms. Earl was injured in two ways by Defendant. *First*, Ms. Earl purchased adulterated and misbranded antiperspirant products that were illegally sold to her, and therefore worthless. *Second*, Ms. Earl was deceived by Defendant's representations and omissions regarding the presence of benzene in the antiperspirant products.

52. Plaintiff Jeanette Rock is a resident of Chicago, Illinois and has an intent to remain there, and is therefore a citizen of Illinois. Within the last year, Ms. Rock has purchased multiple canisters of Defendant's Suave Professionals Dry Shampoo Refresh and Revive product from a Walmart store in Illinois. Ms. Rock purchased the dry shampoo products for personal use. When purchasing the dry shampoo products, Ms. Rock reviewed the accompanying labels and disclosures, and understood them as representations and warranties by Defendant that the dry shampoo products were properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell. Ms. Rock relied on these representations and warranties in deciding to purchase the dry shampoo products manufactured and sold by Defendant, and these representations and warranties were part of the basis of the bargain, in that they would not have purchased the dry shampoo products from Defendant if they had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell. The dry shampoo products Ms. Rock purchased were contaminated with benzene, therefore rendering the products improperly manufactured, defective,

not safe for its intended use, adulterated and misbranded, and illegal to sell. Thus, Ms. Rock was injured in two ways by Defendant. *First*, Ms. Rock purchased adulterated and misbranded dry shampoo products that were illegally sold to her, and therefore worthless. *Second*, Ms. Rock was deceived by Defendant's representations and omissions regarding the presence of benzene in the dry shampoo products.

53. Defendant Unilever United States, Inc. is a Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey. Defendant manufactures, markets, and sells the Products throughout the State of Illinois and the United States. Including in both retail establishments and online.

## JURISIDICTION AND VENUE

54. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

55. This Court has personal jurisdiction over Defendant because Plaintiffs purchased the Products in this District.

56. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District, Defendant has marketed, advertised, and sold the Products in this District, and Defendant has caused harm to Plaintiffs and other Class members in this District.

## CLASS ACTION ALLEGATIONS

57. Plaintiff Earl seeks to represent a class defined as all persons in the United States

who purchased the antiperspirant products for personal or household use within any applicable limitations period (the "Antiperspirant Class").

58.     Plaintiff Rock seeks to represent a class defined as all persons in the United States who purchased the antiperspirant products for personal or household use within any applicable limitations period (the "Dry Shampoo Class").

59.     The Antiperspirant Class and Dry Shampoo Class shall collectively be referred to as the "Class."

60.     Plaintiff Earl also seeks to represent a subclass of all Class Members who purchased the antiperspirant products for personal or household use in Illinois within any applicable limitations period (the "Illinois Antiperspirant Subclass").

61.     Plaintiff Rock also seeks to represent a subclass of all Class Members who purchased the dry shampoo products for personal or household use in Illinois within any applicable limitations period (the "Illinois Dry Shampoo Subclass").

62.     The Illinois Antiperspirant Subclass and Illinois Dry Shampoo Subclass shall be collectively referred to as the "Illinois Subclass."

63.     Plaintiff Earl also seeks to represent a subclass of all Class Members who purchased the antiperspirant products for personal or household use in California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington within any applicable limitations period (the "Consumer Fraud Multi-State Antiperspirant Subclass").[20]

---

[20] While discovery may alter the following, the states in the Consumer Fraud Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code § 17200, *et seq.*); Florida (Fla. Stat. § 501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*).

64. Plaintiff Rock also seeks to represent a subclass of all Class Members who purchased the dry shampoo products for personal or household use in California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, or Washington within any applicable limitations period (the "Consumer Fraud Multi-State Dry Shampoo Subclass").

65. The Consumer Fraud Multi-State Antiperspirant Subclass and the Consumer Fraud Multi-State Dry Shampoo Subclass shall be collectively referred to as the "Consumer Fraud Multi-State Subclass."

66. The Illinois Subclass and the Consumer Fraud Multi-State Subclass shall be collectively referred to as the "Subclasses."

67. The Class and Subclasses are collectively referred to as the "Classes."

68. Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

69. Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

70. **Numerosity.** The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed

members are unknown to Plaintiffs, the true number of members of the Classes are known by Defendant. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution and sales records of Defendant and third-party retailers and vendors.

71. **Typicality.** The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity. The representative Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

72. **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

    (a)   whether Defendant knew or should have known the Products contained or were at risk of containing elevated levels of benzene prior to selling them, thereby constituting fraud and/or fraudulent concealment;

    (b)   whether Defendant is liable to Plaintiffs and the Classes for unjust enrichment;

    (c)   whether Defendant is liable to Plaintiffs and the Classes for fraud;

    (d)   whether Plaintiffs and the Classes have sustained monetary loss and the proper measure of that loss;

(e)     whether Plaintiffs and the Classes are entitled to declaratory and injunctive relief;

(f)     whether Plaintiffs and the Classes are entitled to restitution and disgorgement from Defendant; and

(g)     whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

73.     **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes. Plaintiffs have no interests that are antagonistic to those of the Classes.

74.     **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

75.     In the alternative, the Classes may be certified because:

(a)     the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant;

(b)     the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act
815 ILCS 505/1, *et seq.*
(On Behalf of Plaintiffs and the Illinois Subclass)**

76.     Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

77.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Illinois Subclass against Defendant.

78.     Plaintiffs and other Illinois Subclass Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

79.     Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

80.     At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

81.     Plaintiffs and the proposed Illinois Subclass are "consumers" who purchased the Products for personal, family or household use within the meaning of the ICFA, 815 ILCS

505/1(e).

82.    The ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

83.    The FDCA prohibits introduction into interstate commerce "of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

84.    As the Products are adulterated and misbranded, the FDCA specifically prohibits their introduction into interstate commerce, and thus, actions under the ICFA related to the Products being adulterated and misbranded are not barred by 815 ILCS 505/10b(1).

85.    The ICFA prohibits engaging in any "unfair or deceptive acts or practices … in the conduct of any trade or commerce." ICFA, 815 ILCS 505/2.

86.    The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

87.    Plaintiffs and the other Illinois Subclass Members reasonably relied upon Defendant's representation that the Products were safe for personal use and, due to Defendant's omission of the presence of benzene in the Products, Plaintiffs read and relied on Defendant's labeling to conclude that the Products were not contaminated with any dangerous substance, including benzene.

88.    Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, *et seq.*

89.    Defendant engaged in unfair conduct in violation of the ICFA, including but not limited to selling adulterated and misbranded products in violation of the FDCA and IL FDCA. *Barnes v. Unilever United States Inc.*, 2022 WL 2915629, at *3 (N.D. Ill. July 24, 2022).

90.    Defendant engaged in deceptive conduct, including but not limited to misrepresenting that the Products did not contain or did not risk containing benzene, and failing to disclose that the Products contained or risked containing benzene.

91.    Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

92.    Defendant advertised the Products with intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

93.    Defendant engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

94.    Prior to placing the Products into the stream of commerce and into the hands of consumers to use on their bodies, Defendant knew or should have known that the Products contained benzene, but Defendant not only failed to properly test and quality-check its Products, but further misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Illinois Subclass Members, by not including benzene or the risk of benzene contamination on the Products' labels or otherwise warning about its presence.

95.     Defendant intended that Plaintiffs and each of the other Illinois Subclass Members would reasonably rely upon the misrepresentations, misleading characterizations, warranties and material omissions concerning the true nature of the Products.

96.     Given Defendant's position in the health and beauty market as an industry leader, Plaintiffs and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

97.     Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiffs and each of the other Illinois Subclass Members to be deceived about the true nature of the Products.

98.     Plaintiffs and Illinois Subclass Members have been damaged as a proximate result of Defendant's unfair and deceptive violations of the ICFA and have suffered damages as a direct and proximate result of purchasing the Products.

99.     As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiffs and the Illinois Subclass Members have suffered ascertainable losses of money caused by Defendant's unfair conduct of selling adulterated, misbranded, and illegally sold Products, and its misrepresentations and material omissions regarding the presence of benzene in the Products.

100.    Had they been aware of the true nature of the Products, Plaintiffs and the Illinois Subclass Members either would have paid less for the Products or would not have purchased them at all.

101.    Based on Defendant's unfair and/or deceptive acts or practices, Plaintiffs and the Illinois Subclass Members are therefore entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs, and attorneys' fees, under 815 ILCS 505/10a.

## SECOND CLAIM FOR RELIEF
**Fraud**
**(On Behalf of Plaintiffs and the Classes)**

102. Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

103. Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

104. Defendant made fraudulent misrepresentations and omissions to Plaintiffs and members of the Classes regarding the Products, specifically that the Products contained only the active and inactive ingredients stated on the label, and not harmful impurities such as benzene. Defendant also materially omitted facts from Plaintiffs and members of the Classes, including that the Products in fact contained (or risked containing) harmful levels of benzene.

105. Defendant had a duty to disclose material facts to Plaintiffs and the Classes given that Plaintiffs and the Classes were the intended users of the Products. Defendant also had a duty to disclose material facts to Plaintiffs and the Classes, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

106. Defendant knew or should have known that the Products were contaminated with benzene, but continued to manufacture, distribute, and sell the Products nonetheless. Defendant was required to engage in impurity testing to ensure that harmful impurities such as benzene were not present in the Products. Had Defendant undertaken proper testing measures, it would have been aware that the Products contained dangerously high levels of benzene. During this time, Plaintiffs and members of the Classes were using the Products without knowledge that the Products contained dangerous levels of benzene.

107. Defendant failed to discharge its duty to disclose these material facts.

108. In so failing to disclose these material facts to Plaintiffs and the Classes, Defendant intended to hide from Plaintiffs and the Classes that they were purchasing and using the Products with harmful defects that were unfit for human use, and thus acted with scienter and/or an intent to defraud.

109. Plaintiffs and the Classes reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendant had they known the Products contained unsafe levels of benzene.

110. As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiffs and the Classes suffered damages in the amount of monies paid for the defective Products.

111. As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

112. Plaintiffs incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

113. Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

114. This claim is brought under the laws of the State of Illinois.

115. Plaintiffs and the Classes conferred a benefit on Defendant in the form of monies paid to purchase Defendant's defective and worthless Products.

116. Defendant voluntarily accepted and retained this benefit.

117. Because this benefit was obtained unlawfully, namely by selling and accepting

27

compensation for products unfit for human use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

## COUNT IV
### Violation of State Consumer Fraud Acts
### (On Behalf of Plaintiffs and the Consumer Fraud Multi-State Subclass)

118.   Plaintiffs incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

119.   Plaintiffs brings this claim individually and on behalf of the members of the Consumer Fraud Multi-State Subclass against Defendant.

120.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Subclass prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

121.   Plaintiffs and Consumer Fraud Multi-State Subclass Members have standing to pursue a cause of action for violation of the Consumer Fraud Acts of the states in the Consumer Fraud Multi-State Subclass because Plaintiffs and Consumer Fraud Multi-State Subclass Members have suffered an injury in fact and lost money as a result of Defendant's actions set forth herein.

122.   Defendant engaged in unfair conduct, including but not limited to selling adulterated and misbranded products in violation of the FDCA.

123.   Defendant engaged in deceptive conduct, including but not limited to misrepresenting that the Products did not contain or did not risk containing benzene, and failing to disclose that the Products contained or risked containing benzene.

124.   Defendant intended that Plaintiffs and Consumer Fraud Multi-State Subclass Members would rely upon its unfair and deceptive conduct and a reasonable person would in fact be misled by this deceptive conduct described above.

125.    Given Defendant's position in the health and beauty market as an industry leader, Plaintiffs and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the presence of benzene in the Products.

126.    As a result of Defendant's use or employment of unfair or deceptive acts or business practices, Plaintiffs and Consumer Fraud Multi-State Subclass Members have sustained damages in an amount to be proven at trial.

127.    In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendant as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the representatives for the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: January 20, 2023        Respectfully Submitted,

By: */s/ Carl V. Malmstrom*
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLC**
Carl V. Malmstrom
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
E-mail: malmstrom@whafh.com

*Attorney for Plaintiffs*